(Paxson *v.* Lefferts and another.)

---

[PHILADELPHIA, JANUARY 10, 1831.]

## PAXSON *against* LEFFERTS and another.

### IN ERROR.

3r 59
155 63

3r 59
160 24

3r 59
169 79

Testator devised as follows, *viz.* "I give to my son C. K. my messuage and plantation, situate, &c. which I had from my father, with the buildings, &c. with the rents, issues, to him during his natural life, and if he shall leave lawful issue, then to them, their heirs and assigns forever; but for want of such lawful issue, then it shall return to my son J. K.; and if he should leave no lawful issue after his decease, then to my next lawful heir, and to their heirs and assigns forever."

At the date of the will, the testator had another child, a daughter. C. K., the son, at the time the will was made had no issue, nor had he any subsequently until after the death of the testator.

*Held,* that C. K. took on estate tail.

In the Court of Common Pleas of *Montgomery* county, from which the cause was removed to this court by writ of error, this was an ejectment for a messuage, mill and tract of land; in *Abington* township, in which the defendants in error, *Elizabeth Lefferts* and *Susanna Addis* were plaintiffs, and the plaintiff in error, *Jacob Paxson,* was defendant.

At the trial in the court below, on the 27th *November,* 1827, the following facts were, by the consent of counsel, found by the jury in the form of a special verdict.

On the fifth January, 1761, *John Knight,* being seized in fee of the premises laid in the declaration, made his last will and testament in writing, duly proved, in these words: *viz.*

" I, *John Knight*, of the city of *Philadelphia*, baker, being weak of body, but of sound and perfect mind and memory (blessed be God), do this fifth day of *January*, in the year of our Lord one thousand seven hundred and sixty-one, make and publish this my last will and testament in manner following : *Imprimis*. My will is, that all my just debts and funeral charges be first paid and satisfied. *Item. I give to my son Charles Knight. my messuage and plantation situate in Abintown in the county of Philadelphia, the which I had from my father, with the buildings and apurtinances thereunto belonging, with the rents, issues, to him during his natural life, and if he shall leve lawfull issue, then to them their heirs and assigns forever. But for want of such lawful issue; then it shall return to my son John Knight, and if he should leave no lawful issue after his deceas, then to my next lawfull heire and to their heirs and assigns forever.* And I give to my wife one equal half part of the rent of s^d messuag or plantation after my said son *Charles* deceas during her natural life, and likewise I give to my son *Cherls* my new bakehous situate in fourth street between *James Dilworth* on the north, and *Matthew Cline* on the south side, to him his heirs and assigns forever, under the yearly ground rent of forty shillings a year.

" *Item.* I give to my daughter *Rachel* my house in *Sasifrax* street where *John George* now lives in, with the loot of ground thereunto belonging, the which is thirty-three feet front on the street, and a hundred and fifty foot back, with the apurtinanccs thereunto belonging, to her and her heirs and assigns forever, and two fether beds and beding.

" *Item.* I give to my son *John Knight* my two messuages or teniments in *Sasifrax* street, with the loot of ground as they are built on, thirty-four feet front on said street, and a hundred and fifty foot back, be it more or les, under the yearly ground rent of thirty shillings starling a year, and the house as I now liveth in after his mother's decceas, the which house is at the corner of Mulberry and fourth strect, with the bake house granereys, and all the apurtinances thereunto belonging, to him his heirs and assigns forever, under the yearly ground rent of sixty-two shillings and sixpence a year.

" *Item.* I give to my dear wife *Elizabeth Knight*, my house as is in *Mulberey* street adjoining my corner house as I now lives in, with the aley and the conveniances thereunto belonging, under the yearley ground rent of thirty-five shillings a year, my loot of ground as I bought of *Magdalen Brown*, containing two acres a quarter and half quarter, in *Passyunk* township, with the prividges to me granted, my loot of ground in *Sasifrax* street, containing in breadth thirty-three feet front on said street, under the yearly ground rent of three pounds six shillings starling a year, and my two loots of land as I bought of *John Cox* and *Thomas Wood* in *Abintown*, to her and her heirs and assigns forever, she paying my just debts and funeral expenses out of it, and the corner house as I now lives in at the corner

(Paxson *v.* Lefferts and another.)

of Mulberey and fourth street, I give to her, with the bake house, granareys, stable and other convenienceyes thereunto belonging, during her natural life, and the rent issues and profits of my son *Charlses* land and teniments until he attains to the age of twenty-one years, and likewise the rents issues and profits of my son *John's* teniments, until he attains to the age of twenty-one years, and all my negroes, with all my other estate not heretofore willed or given away, both real and personal whatsoever, to her and her heirs and assigns forever, & my will is, and I do order that my son *Charls* shall have six months schooling next after my decease, and then be bound to a trade as he shall chose, and that my son *John* shall be kept to school until he is fifteen years old, and then to be put to a trade as he shall chose. And I do hereby order, and my will is, that my executor hereafter named shall have full power to binde out my said sons. And of this my last will and testament I make my said dear wife *Elizabeth Knight* sole executrix, hereby making null and void all former and other wills by me made at any time heretofore. In witness I have hereunto set my hand and seal."

The testator afterwards, in the same year, died so seized. At the time of making his said will, the testator had lawful issue then living, to wit, *Charles Knight* his eldest son, *Rachel Knight*, and *John Knight*, and no other. *Charles*, the son of the testator, had no child at the time of making the said will, nor any born during the lifetime of the testator. After the death of the testator, and before the year 1770, *Charles Knight* had lawful issue, four children, to wit, *John*, *Elizabeth*, *Susanna* and *Rachel*. He had no children born during the year 1770, but after that year other lawful issue, to wit, *William* and *Sarah*, and no other children. *John* the eldest son of *Charles*, has not been heard of for fifteen or sixteen years; *Rachel* died before her said father, and *William Knight* also died before his said father, both intestate and without issue; *Sarah* died about five or six years ago, intestate, having married —— *Shaw*, and never having had any issue. *Elizabeth* intermarried with *James Lefferts*, during the life-time of her said father, and was under age at the time of her said marriage. *Susanna* intermarried with *Josiah Addis*, during the lifetime of her said father, and was under age when she so married. *Josiah Addis* died about five or six years ago, and *James Lefferts* about two or three years since. The wife of *John*, the testator, is also deceased.

*Charles Knight* suffered a common recovery of the premises in 1770, and afterwards by deed dated the 6th day of *April*, 1774, conveyed the premises for the consideration therein mentioned to *Andrew Keyser*. *Andrew Keyser*, by deed dated 28th day of *September*, 1792, conveyed the same for the consideration therein mentioned, to *Jacob Paxson*, the defendant, who has been in possession of the premises ever since.

*Charles Knight* died in the month of *August*, 1793. About the

(Paxson *v.* Lefferts and another.)

year 1794, an ejectment was instituted for the recovery of the said premises, under the title of the present plaintiffs then *femes covert*, on which a nonsuit was afterwards had. The defendant erected valuable improvements on the premises, both before and after the said suit, and the plaintiffs knew, at the time the said suit was instituted, that the defendant was erecting on the premises the dwelling house in which he now resides, and the barn belonging to it."

The deed of the 6th of *April*, 1774, from *Charles Knight* to *Andrew Keyser*, contained the following covenant, *viz.*

" And the said *Charles Knight*, for himself, his heirs, executors and administrators, doth covenant, promise and grant to, and with the said *Andrew Keyser*, his heirs and assigns, and every of them by these presents, in manner and form following; that is to say, that he the said *Charles Knight* and his heirs, the aforesaid messuage or tenement, grist mill, mill race, tracts, parts and pieces of land, hereditaments, and all and singular the premises hereby granted, bargained and sold, or mentioned or intended so to be, with their and every of their appurtenances, unto the said *Andrew Keyser*, his heirs and assigns, against him the said *Charles Knight* and his heirs, against the heirs and assigns of the said *John Knight* the father, deceased, and against all and every other person or persons, whomsoever, lawfully claiming or to claim by, from, or under him, them or any of them, shall and will warrant, and forever defend by these presents."

By consent of counsel, the court below, without argument, gave judgment for the plaintiffs, upon which the defendant sued out a writ of error.

*Rawle* junr. for the plaintiff in error, contended,

*First.* That *Charles Knight*, the devisee of the land in dispute, under the will of his father, *John Knight*, took an estate tail by implication, with remainder in tail, to the testator's second son *John*, remainder in fee, to the heirs of the testator, and that this estate tail was barred by the common recovery suffered in the year 1770, by *Charles* to the use of himself in fee. Such an estate vested in him by virtue of the rule in *Shelly*'s case, by which, wherever the ancestor takes an estate of freehold, and a remainder is thereon limited in the same instrument, to his heirs, the heirs of his body, (or which is the same thing, his *issue*,) such remainder is immediately executed in the ancestor. Without enquiring into the comparative soundness of the opinions of those, who with Mr. *Hargrave*, Lord *Thurlow*, and others, maintain this to be an absolute, imperative, unbending rule of law, which rides over the intention of the testator, and of those, who with Lord *Mansfield* and others, consider it of a more flexible and yielding character, it may be safely affirmed to be *a fixed and settled rule of construction*, binding upon courts, unless the intention of the testator plainly appear to be incompatible with it. In the will under consideration, no estates are given, inconsistent with the application of the rule; on the contrary, it is impossible to give full effect to the

(Paxson *v.* Lefferts and another.)

intention of the testator, without its aid. In this, as in every other instance in which similar language is used, the testator no doubt intended to give only an estate for life to the first taker : but he also intended to give other estates, which could only take effect, by merging the estate for life, to *Charles,* in the inheritance; and the *particular,* must give way to the *general* intention. This is the conclusion at which we must arrive, if we look only at the devise to *Charles,* apart from every thing else. It is fortified by the devises over to *John* and the heirs of the testator, and receives much additional strength, by reference to other parts of the will. How would the case stand upon the devise to *Charles* alone? In determining this question it is necessary to enquire, *First,* How it would be if there were no limitation engrafted upon the devise to the issue ? *Second.* What is the effect of these words of limitation ? Omitting the words of limitation superadded to the devise to the issue of *Charles,* the devise would be to *Charles* for life, and if *he should leave issue, then to them, but for want of such issue,* over. At the time of the devise, and until several years after the death of the testator, *Charles* had no issue. The testator, therefore, could have had no particular persons in view, but intended that the estate should pass from *Charles* to such persons as could make title to it as his *issue,* that is, as the *heirs of his body;* for wherever the term *issue* is used in reference to persons not *in esse,* it is synonimous with the term *heirs of the body. Wylde's Case,* 6 *Rep.* 17. 4 *Bac. Ab.* 261. *Preston on Estates,* 379. The words " if he shall leave issue," and " for want of such issue," are uniformly construed to mean an indefinite failure of issue. Such language does not refer to issue living at the death of the first taker, but looks to the whole line of descent from him, and gives him an inheritance. By force of these words an express estate for life is often enlarged to an estate tail, and an estate in fee is cut down to an estate in tail. *Irwin* v. *Dunwoody,* 17 *Serg. & Rawle,* 61. *Caskey* v. *Brewer, Ib.* 441.

As strong a case as any other in support of this principle is that of *Robinson* v. *Robinson,* 1 *Burr.* 38, in which the devise to the first taker, was not only expressly for life " *and no longer,*" but an estate was afterwards given to his *son,* yet by force of the words "for default of such issue," it was held to pass an estate tail. Many other English decisions, both before and since the Revolution, support the same position ; but it is unnecessary to cite them, as abundant authority for it is found in our own books. *James's Case,* 1 *Dall.* 47. Lessee of *Evans* v. *Davis,* 1 *Yeates,* 332. What effect have the words of limitation engrafted upon the devise to the issue of *Charles* upon the estate given to him ? There are cases, certainly, in which the addition of words of limitation to a devise to the heir, after an estate for life to the ancestor, will convert the heir into a purchaser. The learning on this subject is extremely subtle and refined. Distinctions are sometimes taken, where the difference is not very perceptible. But it may be safely averred, that there is no case of a devise to one for life, and after

(Paxson *v.* Lefferts and another.)

his death to his heirs, to the heirs of his body, or to his issue, in the plural number, with words of limitation superadded, in which such heirs, heirs of the body or issue, have taken as purchasers, unless the course of descent indicated by the superadded words, was different from what it would have been if the inheritance had vested in in the first taker. In all the cases on which this doctrine rests, the devise was to the *heir* in the singular number, who was thus described as the stock in whom the inheritence was to commence, or the engrafted words carried the estate into a different channel of descent. In *Archer's Case*, 1 Co. R. 66, the root from which this doctrine sprang, the limitation was to *A.* for life, and after his decease to the next *heir* male of *A.*, and the heirs of the body of such next *heir* male, and the devise to him was held to be a remainder by purchase. *Luddington* v. *Kime*, 1 Ld. Ray. 203, perhaps the most prominent case on the subject, went upon the same ground. The devise was to Sir *Evers Armyn* for life, *without impeachment of waste*, and in case he should have any issue male, then to such issue male and *his* heirs forever, and if *he* should die without issue, then to Sir *Thomas Barnardiston* in fee. Here were several circumstances, which marked it as an exception to the rule in *Shelly's Case*. There was not only an express estate for life, to Sir *Evers Armyn*, but it was *without impeachment of waste*, words much relied upon by the court, and which would have been nugatory, if he had taken an estate of inheritance. The devise of the remainder was to the issue in the singular number, which was held to be *designatio personæ*, pointing out the individual who was to take the inheritance, after the estate for life was spent. The same feature will be found in all the cases, in which the superadded words have been held to convert words of limitation into words of purchase. *Fearne on Rem.* 193. There are many cases very analogous to that now under consideration, in which words of limitation engrafted on a devise to *heirs, heirs of the body*, and *issue* in the *plural number*, have put the estate in a course of descent from the first taker, by the operation of the rule in *Shelly's Case*. *Goodright* v. *Pullyn*, 2 Ld. Ray. 1437. *Wright* v. *Pearson, Ambler*, 358 *King* v. *Burchell, Ambler*, 379. S. S. 4 *T. R.* 296, *note*. *Morris* v. *Le Guy*, cited in *Doe* v. *Laming*, 2 *Burr.* 1102, and in *Denn* v. *Puckey*, 5 *T. R.* 302. *Dodson* v. *Grew*, 2 *Wils.* 322. *James's claim*, 1 *Dall.* 47, already cited for another purpose, is also an authority to show, that words serving to limit the fee to the issue of the first taker, do not convert the issue into purchasers. The case of *Carter* v. *M'Michael*, 10 *Serg. & Rawle*, 429, in which this branch of the law is fully considered by the court, is conclusive on this point. The conclusion to be deduced from all the authorities is, that the word *issue* in a will, when used in reference to persons not then born, and not used in the singular number to describe a particular person, but in the plural number to point out the line of descent, is synonimous with the words *heirs of the body*, and that words of limitation engrafted on a devise to the issue of the devisee for life, never make

the issue purchasers, though such words serve to limit a fee and not a fee tail. They have this effect only where they would carry the estate into a different channel from that in which it would flow, by giving to the first taker an inheritance. There are no authorities, which impugn this doctrine, though there are some, which vary the uniformity of the rule, which governed *Archer's Case.* In *Fearne,* 181, 182, 183, 184, 193, the cases are very elaborately reviewed, and this is the shore, on which the doctrine is landed.

Admitting, that under the first branch of the devise to the issue of *Charles,* and their heirs, they would have taken as purchasers, yet the devise over to *John* for want of issue of *Charles,* and the second devise over to the testator's heirs on the failure of the issue of *John,* make it inconsistent with his general intention, that the issue of *Charles* should take in any other way than by limitation, and conse- quently *Charles* took an estate tail. This conclusion is fortified by the situation of the testator's family, and the other dispositions of his property. He had two sons, *Charles* and *John,* and a daughter, *Ra- chel.* To his eldest son, *Charles,* he devises the *paternal estate,* and declares that if he shall not leave issue, it shall *return* to his second son, *John,* and upon failure of his issue, shall go to his own next law- ful heir in fee. Independently of the established rules of construc- tion, some light may be gathered as to his intention, from other parts of the will. At the time of the devise, *Charles* was a boy, and could not have forfeited the good opinion of his father. It is impossible, therefore, to suppose, he meant to make a worse provision for him than for either of his other children, yet that would be the case, if *Charles* took only an estate for life. He would only have had an estate for life in the plantation, and a back bake-house, while *John* would have had two houses in *Sassafras* street, and the testator's dwelling-house at the corner of *Mulberry* and *Fourth* streets, besides the patrimonial estate in tail, in the event of his brother's death with- out issue. The testator could have had no motive for thus, as it were, disinheriting his eldest son, who was as dear to him at least as his other children, and to whom, according to the habits and prejudices of that day, it might be supposed, he would give a preference, if he made any distinction between his children. He manifested a strong inclination to keep this estate, "which he had from his father," in his own family and name, and with this view, he made provisions by his will, as many others have done, which the law would not permit to take effect exactly in the manner intended. No doubt he intended, that *Charles* should enjoy the estate only for life, without the power of alienation, but he also intended, that it should pass through the whole line of *Charles,* for he never could have meant, that his son, whom he knew and was attached to, should have a circumscribed estate, comparatively of little value, and that the moment he died, his issue, whom the testator never saw, should become absolute masters of it. Common reason, and the first principles of our nature negative such an idea. He plainly meant, that all the issue of *Charles* should take

in succession, and that when his line was exhausted, it should pass to the line of *John,* or as he forcibly expressed it, *return* to *John.* He thus manifested his fixed determination, so far as he could, to keep the estate in his family name. He first puts it in the channel of his eldest son's blood, and after it has passed through that, makes it return to that of his second son, and when that is exhausted, he places it in the line of his next heir, which is the line of *Rachel,* to which he gives a fee. The reason for this distinction is obvious. When the estate passed into the line of the daughter, it could no longer be connected with the family name, and therefore he was indifferent whether it continued in that line or not.

It is impossible to doubt, that he intended, that *Charles* and *John* should enjoy the estate in exactly the same way ; and it is equally impossible to doubt, that the devise to *John* passes an estate tail. If therefore, there existed any doubt as to the devise to *Charles,* standing by itself, that doubt would be removed by connecting it with the devise to *John.* By construing the words of the devise to *Charles,* to be words of limitation, effect is given to every part of the will, which cannot otherwise be done. If they are words of limitation, *Charles* takes an estate tail, remainder in tail to *John,* remainder in fee to the heirs of the testator; but if they are words of purchase, the devise over to the heirs of the testator must be defeated. If the devise to *Charles,* gave an estate for life, the devise to *John* might take effect as an executory devise, because the contingency, on which the estate would go over, would be the death of *Charles* without issue living at his death; but it could not go over to the heirs of the testator until after an indefinite failure of the issue of *John,* a contingency too remote for the rules of law to permit. *Fearne,* 444. 2 *Bl. Com.* 173, 174. As then this limitation over can take effect as a remainder by giving an estate tail to *Charles,* and cannot take effect at all, if *Charles* takes only an estate for life, with remainder in fee to his issue, the devise to *Charles* must be construed so as to pass an estate tail in order to effectuate the general intent of the testator.

2. If, however, the true construction of the will be, that a general failure of the issue of *Charles* was not contemplated by the testator, then his intention must have been to give the estate to such issue as *Charles* might have living at the time of his death, and in that case, the remainder was contingent. At the time of the devise, *Charles* he had no issue. At the time he suffered the common recovery, had issue, and other issue was born afterwards. But at the time the recovery was suffered, it was uncertain, what issue he would have at the time of his death, which was the period at which the remainder was to take effect. A criterion by which to determine whether a remainder is vested or contingent is the power of alienation. If it be vested, the remainder man may dispose of it. Now the issue of *Charles,* though born before the recovery, could not aliene the remainder, because it was uncertain what other issue their father might have, and consequently what would be the share of each. Every thing must rest in contingency until the death of *Charles. Abbott* v.

(Paxson v. Lefferts and another.)

*Jenkins,* 10 *Serg. & Rawle,* 296. *Stump* v. *Findlay,* 2 *Rawle,* 168. If the remainders were contingent, they were destroyed by the recovery, which worked a forfeiture of the estate for life. *Lyle* v. *Richards,* 9 *Serg. & Rawle,* 322.

3. The ancestor, *Charles,* aliened the estate with express warranty, which has descended upon the plaintiffs below, as his heirs, who cannot claim in opposition to the warranty. This is a lineal warranty, because it descends from an ancestor, from whom the title to the estate might have descended. But admitting it to be a collateral warranty, the heir is bound by it. In *Pennsylvania,* a collateral warranty, by tenant for life, even without assets, binds the heir. It was so at common law as respects all collateral warranties. 2 *Bl. Com.* 301. *Shep. Touch.* 188, 189. 194. By various acts of Parliament, of which some are, and some are not in force in *Pennsylvania,* the law at this day is different in *England.* By the statute of *Gloucester,* 6. *E.* 1. c. 8, warranty, by tenant by the curtesy, does not bind the heir without assets in fee simple. And the statute 4 *Ann.* c. 16. sec. 21. puts an end to all warranties by tenant for life. Independently of the statute of *Anne,* the warranty contained in the deed of *Charles Knight* would bar the entry of his heir, even in *England,* and that statute has not been extended to *Pennsylvania. Eshelman* v. *Hoke,* 2 *Yeates,* 509. *Jourdan* v. *Jourdan,* 9 *Serg. & Rawle,* 269. The objection raised in the last mentioned case, that a warranty descends only upon the heir at law, has no room in this case, because the plaintiffs below were together his heirs at law.*

---

* The Reporter has been favoured by a friend with the following note.

Warranty of land, in its strict sense at common law, is so little known in practice among us, that it is hoped the introduction of a few remarks on the subject will be excused.

The difference between lineal and collateral warranty, is not so distinctly shown in *Blackstone's Commentaries,* as in *Coke on Littleton,* chapter Warranty, which he who wishes to understand this subtle and almost obsolete branch of the common law should consult with great attention.

An express warranty could only be created by the word *warrantizo, Litt.* § 733. Whether express or implied it operated in two ways:

1. The warrantee could implead the warrantor either before or after eviction. The former is one of the few cases at law, of the suit preceding the injury, which were called *brevia anticipantia, Coke on Littleton,* 100, *a.* Fitzherbert, in the *Natura Brevium,* 312, says, it is good policy to bring the *warrantia chartæ* before being sued, as it binds the lands of the warrantor which he held at the time the writ was sued out. This, however, would be a very inconvenient rule at the present day, and in this country, where the alienation of lands is so much more frequent than it was in feudal times.

A writ of *warrantia chartæ* was only resorted to when the warrantee was sued in an action in which he could not vouch, as in an assize, or in a writ of entry in the nature of an assize. *Fitz. Nat. Brev.* 310.

But whether the warrantee proceeded by voucher or by *warrantia chartæ,* the heir at common law was the only ostensible or nominal party in the first instance.

2. Warranty, however, also operated in another manner, which is designated in the old books by the name of a *Rebutter, Coke on Litt.* 365, *a.* It defended the warrantee against the claims of the warrantor and his heirs, and this, as justly observed in *Shepherd's Touchstone,* on the principle of avoiding circuity of action.

In this country, where descents are partible, great inconvenience and injustice would ensue from applying the rule, that a warranty bound only the heir at common law, in the operation of a warranty by way of rebutter.

(Paxson *v.* Lefferts and another.)

4. The entry of the plaintiffs below is barred by the act of limitations of 26th *March*, 1785, *Purd. Dig.* 532. Their right of entry accrued in the year 1770, when their father suffered the common recovery, by which his life estate was forfeited. An immediate right

---

The analogy between the custom of gavelkind, and our system of descents, affords an exposition which we cannot but adopt. It is true that the text of *Littleton* is express, that a warranty of lands held in gavelkind, descends only on the heir at common law, and shall not bind "the heirs that are heirs according to the custom." *Litt.* § 736. The same rule applies to land held in borough English. *Ib.* § 735. In the latter instance the case, as put by *Littleton*, appears extremely hard on the purchaser. The youngest son of the tenant in tail, who discontinued with warranty, was not barred, although land to an equal or greater amount in value had descended to him from his father. But the subtle notion of the descent of the warranty on the heir at common law alone, productive of such injurious effects, was got rid of by an ingenious contrivance for the promotion of justice. Although the customary heir was not considered directly liable on the warranty, yet he was held so by reason of the inheritance. See *Coke on Litt.* 376, *a*. And either by being directly vouched by the warrantee, or by being vouched by the heir at common law, in case the latter alone had been vouched, (either of which courses was at the election of the warrantee) the customary heir could be rendered liable. See *Robinson on Gavelkind*, 127. 1 *Leon.* 112. *Cr. Jac.* 218. *Coke on Litt.* 12, *a*. *Mr. Hargrave's notes*, (1). The principle applies with double force in the case of a rebutter. It cannot be conceived that a gavelkind heir, or the youngest son in a case of borough English, who would thus be made responsible if the warrantee were evicted by a stranger, should not be rebutted in case he claimed the land himself, when the warrantee could thus circuitously recover the same land from him afterwards.

In the case of *Jourdan* v. *Jourdan*, 9 *Serg. & Rawle*, 268, the attention of the court was drawn only to the general rule, without its qualification. That decision is the chief cause of the present note. It is believed that if the counsel for the plaintiff in error had pursued his researches a little further, and laid the authorities before the court, the result of that case would have been different.

But warranty, in its original form, has long been abolished both here and in England. The more plain and pliable form of covenant has been substituted. The grantor for himself, his heirs, &c. covenants with the grantee, his heirs and assigns, that he and his heirs, executors and administrators, will *warrant* and defend the premises conveyed, against himself, his heirs, &c. either generally or specially, as the parties agree. This is *prima facie* a covenant to do what in the old form was expressly done, and it might admit of a curious construction. If, by the warranty in its original nature, the warrantor was obliged to render land only, the covenantor might perhaps be entitled to tender land as a compliance with his covenant, and might also avail himself of all the niceties and subtleties which characterized the ancient doctrine.

It is true that in some cases damages were also recoverable by the warrantee. If a man be impleaded in assize, &c. and he brings a writ of *warrantia chartæ*, if the plaintiff recover his warranty he shall recover his damages, and also to have the value of the land lost. *Fitz. Nat. Brev.* 315.

But it would seem that the same rule did not take place, if the warrantor was vouched, and not sued by *warrantia chartæ*. *Br. Warr. Chart.* 31.

In *Duval* v. *Craig*, 2 *Wheaton*, 45, there was in the same deed a covenant that the land was free of incumbrances, and also an express warranty (not a covenant to warrant) that if the land, or any part of it, shall at any time be taken by a prior legal claim, the grantors and their heirs shall make good to the grantee and his heirs, the part lost by supplying other lands in fee of equal quantity and quality, but the court held that the latter did not apply to the first covenant, and therefore the effect of the warranty was not decided. It may be presumed, that if the court had held this clause of the deed to be before them, they would have deemed it necessary either that a proper writ of *warrantia chartæ* should have been issued, after the eviction, or if it was competent to the grantee to proceed by an action of covenant, that notice should have been given, and a demand of other lands made.

We have no reason to believe, that, in this state, a covenantor ever attempted to dis-

(Paxson v. Lefferts and another.)

of entry accrued on the forfeiture.  1 *Cruise on Real Property*, 93, 94.  *Abbott* v. *Jenkins*, 10 *Serg. & Rawle*, 296.  Supposing the youngest of the plaintiffs to have been just born, when the recovery was suffered, her infancy ceased in 1791.  Since that period no suit has been brought, except one which was discontinued.  It is true, they married during infancy, and their coverture has only ceased within a few years, but this is no answer to the Act of Limitations, because one disability cannot be fastened upon another, so as to save their rights beyond the time prescribed by the statute.  *Thompson* v. *Smith*, 7 *Serg. & Rawle*, 209.

5. Since *Charles Knight* sold the property in dispute to *Andrew Keyser*, from whom the defendant below derived title, valuable improvements have been made with the knowledge of the plaintiffs below, who after the lapse of fifty years, not only claim the land, for which their father has received the full value, but the improvements also.  This is forbidden by one of the plainest and most familiar principles of equity, that a man shall not be permitted to stand by and see another make improvements on land claimed by him, without giving notice of his claim, and afterwards assert that claim to the injury of the other.  *Sugd. on Vend.* 522.  1 *Madd. Ch.* 209, 210.  *East India Company* v. *Vincent*, 2 *Atk.* 82.  The plaintiffs below gave no notice of their claim, except by a suit about the year 1793, which they afterwards abandoned.  This makes the equity against them stronger, as it gave the defendant below reason to believe that whatever claim

---

charge himself of the covenant to warrant and defend, by pleading that he was always ready to convey lands of equal value, or by showing that he had no notice of the eviction, and no demand of other land, &c.  On the contrary the covenant, like all other covenants, has always been held to sound in damages merely, which after judgment, may be recovered out of the personal or real estate as in other cases.  If indeed the covenant admitted of such a construction, little advantage would be gained by it.  In the case of *Williamson* v. *Codrington*, 1 *Vez.* 510, which was a voluntary settlement on illegitimate children of real and personal estate, with a covenant to warrant and defend, Lord *Hardwicke* held, that the word warrant must be " construed in a larger sense than warranty in its strict legal sense; as large as defend."  There being personal property included in the covenant was adverted to by his lordship, but in reference to the real estate the distinction was also taken.  And the course of the reasoning may, we think, be considered as now settled, that although the word *warrant* be introduced, yet the emphatical part of the covenant is to *defend*.  See *Kent's Commentaries on American Law*, vol. 4, p. 457, in which the "learned opinion" of Judge DUNCAN, 11 *Serg. & Rawle*, 109, is cited with the praise it deserves.

The result on the whole seems to be, that a covenant to warrant and defend, is to be construed a covenant running with the land, to defend the covenantee, his heirs and assigns; and that it precludes the grantor and *all* his heirs and assigns (not merely the heir at common law) from claiming it, and binds all his estate, real and personal, in case of eviction by a stranger, to the amount of the damages sustained.  The measure of those damages may be considered in some degree fixed with us, by the decision in *Bender* v. *Fromberger*, 4 *Dall.* 442, viz. that the amount of the purchase money can alone be recovered.  In a very able note to the case of *Duval* v. *Craig*, a view is taken of the rule that prevails in different states on this subject.  Whether interest shall be recovered without an allowance for the use and profits of the land during the time it was enjoyed by the grantee, must depend upon the circumstances.  A jury would be competent to decide on those circumstances.

they may have supposed themselves to possess, was relinquished, and thus he was encouraged to make further improvements. It would be against equity to permit the plaintiffs below to recover at all, and still more so, to permit them to recover without previously tendering the value of the improvements with interest.

*Chew* for the defendants in error, contended,

1st. That vested rights in remainder cannot be affected by a recovery suffered by tenant for life. *Stat.* 14 *Eliz.* ch. 8. *Lyle* v. *Richards*, 9 *Serg. & Rawle*, 53. *Dunwoodie* v. *Reed*, 3 *Serg. & Rawle*, 453.

*Charles Knight* took merely an estate for life. An estate given for life expressly is never enlarged by implication. *Ginger* v. *White*, *Willes, Rep.* 348. *Dunwoodie* v. *Reed*, 3 *Serg. & Rawle*, 438, 439. *Findlay* v. *Riddle*, 3 *Binn.* 148. Since *Archer's Case*, 2 *Co. R.* 66, the word ' *heir*,' with words of inheritance superadded, has always been held to give the devisee an estate by purchase. *Fearne*, 152; and the word " *issue*," yields to the rule in *Shelly's Case*, with more difficulty than the word " *heir*," *Preston on Estates*, 294. *Lord Glenorchy* v. *Bosville, Cas. Temp. Talb.* 3. *Fearne*, 117. Wherever words of limitation are superadded, the word " *issue*," is construed to be *designatio personæ*. *Luddington* v. *Kime*, 1 *Ld. Ray.* 205. *Preston on Estates*, 278. 280. *Fearne*, 150. 153. In *Findlay* v. *Riddle*, from 149 to 153, Judge Yeates enumerates the cases in which the words " *heirs*," and " *issue*," are taken as words of purchase. The use of the word " *issue*," in the will of *John Knight*, as *nomen collectivum*, repels the presumption, that the testator meant it as a word of inheritance. The word " *then*," in the devise of the estate, " *then* to the issue and their heirs*," is an adverb of time denoting the time when the issue or children of *Charles* were to take, and the word " *heirs*," in the plural number shows, a new inheritance was to commence in them. The reasons given in the *English* books, why the word " *issue*," or " *heirs*," in the plural number, shall be construed as words of limitation, do not apply in *Pennsylvania*, where all the children take together, and constitute one heir. Wherever the words engrafted on the word " *issue*," would take the estate into a different course of succession from words giving the inheritance to the first taker, the issue take the estate as purchasers. *Fearne*, 183. Thus, if an estate tail be first given, as to the issue male of the first taker, and words be engrafted upon this devise serving to limit the fee, the first taker will have an estate in tail male; but if the words be not such as must necessarily be construed an estate tail in order to effectuate the general intent of the testator, but the devise be to the issue of the first taker in fee, no case can be found in which the issue have been held to take by limitation, and not by purchase. It is competent to the testator, if he pleases, to make the heir of the tenant for life, a new stock, from which the inheritance shall in future descend. *Co. Litt.* 379. *note A.* The only question is as to his intention. The ntention of *John Knight* clearly was to preserve the estate in the

(Paxson *v.* Lefferts and another.)

issue of his son *Charles,* free from the control of their father, to whom he gave an express estate for life only.   That such was his intention cannot be questioned.   Half the rent is given to his wife, after the death of *Charles,* that is, as soon as the new stock comes into possession.   *Hodgson* v. *Ambrose, Doug.* 337.  *Preston on Estates,* 273. 275. *Doe* v. *Provoost,* 4 *John.* 63.   The *English* cases from *Goodright* v. *Pullyn,*2 *Ld. Ray.* 1357, to *Denn* v. *Puckey,* 5 *D. & E.* 299, and the cases cited from our own reports, go no further than to decide, that where the first limitation would amount to an estate tail special, or an estate tail male or female, the superadded words of inheritance limiting the fee will be disregarded; but where the devise is expressly for life, and if issue be left, then generally to the issue with words of inheritance engrafted upon the devise to the issue, the rule of construction as traced down from *Archer's Case,* that the first taker shall have only an estate for life, has never been overruled.   *Morris* v. *Le Gay,* cited in 10 *Serg. & Rawle,* 432, was a devise to *A.* for life, and then to the heirs of the body of *A.* and their heirs.  The word " *heirs,*" in the plural number, was used throughout, and the general intent clearly was to give an estate tail to *A.*   *Dodson* v. *Grew* was a devise to *A.* for life, and then to his issue male, and the heirs male of such issue male, and the general intent of the testator could not have been effectuated, except by giving an estate in tail male to the first taker.   In *Robinson* v. *Robinson,* 1 *Burr.* 38, no words of inheritance were superadded to the limitation to the issue. *Wright* v. *Pearson,* and *King* v. *Burchell,* were both cases of estates in tail male, and the words " share and share alike," used in the last case, received an opposite construction in *Abbott* v. *Jenkins,* 10 *Serg. & Rawle,* 298, 299, where the argument is relied on that the legal representatives of the issue are to take.   *Carter* v. *M'Michael,* 10 *Serg. & Rawle,* 432, was also a case of remainder to heirs male.   In no case cited by the counsel of the plaintiff in error, was the devise to the issue generally, with words of inheritance superadded generally, as in the present devise.   In *Irwin* v. *Dunwoody,* 17 *Serg. & Rawle,* 61, and in *Caskey* v. *Brewer, Ibid.* 441, there were no words of inheritance superadded to the word " *issue.*"   The rule in *Shelly's* case is derived from the dark ages ; its reason has long since ceased, and it is not to be extended beyond actual precedents.

2d.  The children of *Charles Knight,* took vested and not contingent remainders in fee, which were not affected by the recovery suffered by their father.   The remainders vested in the children who were born at the time of the recovery, opened from time to time to let in the children who were afterwards born.   2 *Cruise Dig.* 234, 235. secs. 15, 16, 17.    *Doe* v. *Provoost,* 4 *John. Rep.* 61.    *Abbott* v. *Jenkins,* 10 *Serg. & Rawle,* 299.

3. The plaintiffs below were not barred by the warranty of *Charles Knight.*   They do not claim title by descent from him, but under the will of their grandfather *John Knight.*   His warranty therefore was collateral, *Co. Lit.* tit. *Warranty,* sec. 705. And it is by no

means certain, that collateral warranty will bar in *Pennsylvania*. Warranty will not bar unless the estate be divested and turned to a right, at the time the warranty is made. *Viner*, tit. *Voucher*, H. 9 *Rep*. 106. *Edward Symond's* case, 10 *Rep*. 96, *b*. *Charles Knight*, having forfeited his estate for life by suffering a recovery, could not afterwards divest the rights of those in remainder; and having no estate, he could then only make a warranty by disseisen, which creates no bar. *Charles Knight's* deed with warranty, was a bargain and sale; and bargainee shall not vouch to warranty. *Gilb. Law of Uses*, 102, 103. *Viner*, tit. *Voucher*, sec. 11. *Smith* v. *Pierce*, *Carth*. 101. 1 *Saund*. 260. 1 *Rep*. 98. 4 *Lev*. 124. At all events, the plaintiffs below are not bound by the warranty. Warranty descends upon the heir at common law. *Litt*. sec. 718. *Jourdan* v. *Jourdan*, 9 *Serg. & Rawle*, 268. *Non constat*, that *John* the son of *Charles Knight* died without issue. He was the heir at common law, and the heir upon whom the warranty has descended, if upon any one, is to be sought for in his line. *Eshelman* v. *Hoke*, 2 *Yeates*, 509, was a case of warranty by tenant by the curtesy, and within the statute of *Gloucester*. Another reason why the plaintiffs below are not affected by the warrantee is, that they were not of full age. It is a settled rule, that warranty will not bar unless the party sought to be affected by it is of full age when the warranty falls. *Shep. Touch*. 178.

4. The entry of the plaintiffs below is not barred by the act of limitations. It runs only from the time the right of entry accrued, which was at the death of *Charles Knight*, the tenant for life. *Wells* v. *Prince*, 9 *Mass. R*. 508. *Bigelowe's Dig*. tit. *Devise*. They could not enter for the forfeiture produced by the recovery, because they were not the heirs at common law. *Jourdan* v. *Jourdan*, 9 *Serg. & Rawle*, 268.

When Mr. *Chew* was about to commence his argument in relation to the improvements made by the plaintiff in error, the court told him it was unnecessary for him to speak to that point, as there was nothing in the case to show concealment of title, or acquiescence by the defendants in error in the erection of the improvements.

The opinion of the court was delivered by

KENNEDY, J.—This case has grown out of the will of *John Knight*, dated the fifth day of *January*, 1761. That part of the will out of which the question to be decided arises, is in the following words. " I give to my son *Charles Knight* my messuage and plantation situate in *Abington*, in the county of *Philadelphia*, the which I had from my father, with the buildings and appertinances thereunto belonging, with the rents issues to him during his natural life ; and if he shall leave lawful issue, then to them, their heirs and assigns forever. But for want of such lawful issue, then it shall return to my son *John Knight ;* and if he should leave no lawful issue after his decease, then to my next lawful heir, and to their heirs and assigns forever."

At the date of the will the testator had another child, a daughter, named *Rachel. Charles,* the son, at this time had no issue ; nor had he any subsequently until after the death of the testator. The decision of the contest here depends upon the solution of the question, What estate did *Charles* take under the above devise?

The case of *Carter* v. *M'Michael,* in 10 *Serg. & Rawle,* 429, is not unlike the present. The application of the principles laid down by this court in that case, will go far towards deciding the question in this. The testator in that case gave to his son *Edward* two tracts of land, to hold to him and his assigns, for and during the term of his natural life, he making *no waste or destruction* of the timber thereupon, and paying thereout to the testator's daughter *Agness* the sum of twenty pounds in gold or silver money, within the space of two years after his wife's decease : and *from and immediately after* the decease of his son *Edward,* he devised one of the said tracts to his sons *Joseph* and *Daniel,* their heirs and assigns forever, as tenants in common ; and the other to the heirs male of the body of his said son *Edward,* lawfully to be begotten, and the heirs and assigns of such heirs or heir male, forever ; and for want of such heirs male, then to his said two sons *Joseph* and *Daniel,* their heirs and assigns forever, as tenants in common. The opinion of the court in this case was delivered by the late Chief Justice TILGHMAN, deciding that *Edward,* the devisee, thereby took an estate tail. Yet it is manifest from the words of the will, that the testator did not intend that he should have more than an estate for life ; for he not only declares most expressly, that it shall be *for and during the term of his natural life,* but further prohibits him from committing *waste or destruction of the timber thereupon ;* thus depriving him of all privileges other than those of a mere tenant for life But in order to carry into effect the general intent of the testator, the court felt itself bound to disregard and overrule this particular design of the testator as respected *Edward* personally.

In the case now to be decided, the testator has employed no terms, which would seem to indicate a desire on his part to deprive *Charles,* the devisee, of the common and ordinary privileges of a tenant in fee tail. It is given to him with the buildings and appurtenances thereunto belonging, with all the rents and issues thereof, to be used without any *express* restriction whatsoever. The words " during his natural life," it is true, are superadded, but it will be seen that these words have no effect, where they are opposed to the general intent of the testator, as in the case already cited. In that case the general intent of the testator was, that the male issue of *Edward* should take, to the exclusion of all others, and that the estate should not go over so long as there were any of such issue in being. This intent, however, was incompatible with a mere life estate in *Edward,* and consistently with the rules of law, could not be effectuated without giving to him an estate tail male under the will, which was accordingly done by the decision of the court. So in the case before the court, it is manifest, that the general intent of *John Knight,* the tes-

tator, was, that immediately upon the decease of his son *Charles*, the estate devised to him, should go to the heirs generally of the body of *Charles*, and not to *John*, or any other, until after an indefinite failure of the issue of *Charles*. But upon such failure, whensoever it might happen, it is also equally manifest, that the testator intended, that it should pass to his son *John*, or his issue; and in the event of his, and his issue, both being or becoming extinct, it was to go over. Now to hold that *Charles*, took but a life estate, as contended for, by the counsel for the defendant in error, and that his children have a remainder in fee, must necessarily defeat the remainder over to *John* and his issue; because it is not only too remote to take effect consistently with the rules of law, but in short it leaves no remainder for them. The fee simple was all the testator had to give, and if that be now absolutely vested in the children of *Charles*, it is all and the most the testator ever had. But can this be permitted in accordance with the intention of the testator? Not well, indeed, unless we suppose, that the testator had a greater regard for the issue of *Charles*, who were not yet in being, and of whom, of course, he could know nothing, than he possessed for *Charles* himself, who was his *first son*, who had shared his most anxious cares as well as parental caresses for many years, and was about to be made the first object of his bounty: it seems incredible to say the least of it. Besides, to say that the testator intended to give *Charles* merely an estate for life with a remainder over in fee to his children living at his death, or as they came into life, would be declaring, that he had less regard for *Charles*, than he appears to have had for his son *John*, which is contrary to the whole tenor of the will. There is no reason for believing that the testator ever intended to give *Charles* a less estate in the devise of this property to him, than he has limited over in remainder to his next son *John* upon the failure of issue on the part of *Charles*. That the estate given over in remainder to *John*, is not a life estate, but an estate tail general by implication, it is believed, cannot, and will not be denied: and so far as personal feeling and attachment could have had an influence upon the testator, there is no reason to believe that he intended less for *Charles*. But admitting that there was some reason existing with the testator for his giving to *John* a greater estate, than he gave to *Charles*, is it not then reasonable, that he should also have felt the more anxious to make *John* as secure as possible in the enjoyment of it, upon the happening of the event, on which it was to go over to him? So that viewed in either light, we would be led to say that *Charles* took an estate tail. Against this it has been contended, that by the very terms of the devise itself, an estate for life only is given to *Charles*. To this an answer has already been given; which is, that in the construction of wills, to effect the general and main intent of the testator, where he has in limiting the duration of an estate devised, used the words " for his life," " during his life," or " during his life and no longer," they are set aside and disregarded. In addition to the case already quoted, the cases of

*Morris* v. *Le Gay*, 2 *Burr.* 1102. *Atk.* 249. *Coulson* v. *Coulson*, 2 *Stra.* 1125. 2 *Atk.* 246. *King* v. *Burchell, Amb.* 379. 4 *Term. Rep.* 296. (*note.*)  3 *Term. Rep.* 145. (*note a.*)  *Dodson* v. *Grew*, 2 *Wils.* 322, are referred to.

In the next place it is urged, that by the will, in the terms used for the devise in question, the property is given upon *Charles'* death, to his " issue," and that the word " *issue*," is a word of purchase, and not of limitation.  In legal construction it is certainly so considered, and never otherwise in the case of deeds.  But in wills it may be taken either as a word of purchase, or of limitation, as will best answer and promote the intention of the testator. *Hoge* v. *Hoge*, 1 *Serg. & Rawle*, 155.  Per YEATES, J.  See also the cases referred to above.

Again, it is said, that the words of inheritance, which are engrafted on the limitation to the *issue* of *Charles*, take this case out of the rule in *Shelly's Case;* and the cases of *Cheek* v. *Day, Moor*, 593. *Archer's Case*, 1 *Rep.* 66, and *White* v. *Collins, Comyn Rep.* 28, are relied on.  In these cases, it is true, that the first taker of the estate was held to have only an estate for life, because the limitation over, after giving to *A.* as in *Archer's Case*, for life, was to the next *heir* male of *A.* (in the singular number,) and to the heirs male of the body of such next *heir male.*  The words " *heir male*," being in the singular number, and words of inheritance superadded, became *designatio personæ*, the root of a new inheritance,—the stock of a new descent.  *Luddington* v. *Kime*, 1 *Salk.* 224.  *Ld. Raym.* 203, is also cited and relied on.  There the devise was to *B.* for life *without impeachment of waste*, and in case he should have any *issue* male, then to such issue male, and *his* heirs for ever.  Here, again, the words of inheritance are engrafted upon the word " *issue*," in the singular number, as is demonstrated by the use of the pronoun " *his*," referring to " *issue*."  Further it appears to have been the intention of the testator to make *B.* a tenant for life, otherwise it would have been unnecessary to have introduced words to protect him from the consequences of committing waste.  Again, the limitation is to the issue *male*, and not to the issue generally of *B.*, which would have been sufficient, it is conceived, to have constituted *B.* a tenant in tail. This last distinction is also a sufficient answer to the case of *Beckhouse* v. *Wells*, which has also been referred to by the counsel of the defendants in error.

The general rule laid down upon this point, as extracted from the cases by Mr. *Fearne*, in his treatise on *Contingent Remainders*, 181, is, if the words be " *heirs*" or " *heirs* of the body, &c." and " *issue* of the body" may be added to supply what is intended here by the " *&c.*" in the plural; in that case even words of limitation engrafted on them, if not inconsistent with the nature of the descent, pointed out by the first words, will not convert them into words of purchase.  In the case of *Dodson* v. *Grew*, already mentioned, 2 *Wils.* 322, the word " *issue*" was the term employed by the testator.  He devised " to *A.*

*for life,* remainder to the *issue* male of his body lawfully to be begotten, and the heirs male of the body of such issue male, and for want of such issue male, over," and held that *A.* took an estate tail.

In another case which has not been referred to, the devise was " to *A.* for life, and after his decease to the *issue* of his body, and the heirs of such issue for ever ; and for want of such *issue* to *B.*" The court seemed to think that *A.* took an estate tail. *Webb* v. *Puckey,* cited in the 3d. *American Edit. of* 8*th Lond. Edit. of Fearne on Cont. Rem.* 203, (*note*). It would be difficult to point out any substantial difference between this last case and the one before the court.

The Court being unanimously of opinion, that *Charles* took an estate tail under the devise of the premises in question to him, and that the defendants in error are barred by the common recovery suffered by him, consider it, therefore, unnecessary to give any opinion upon the other questions raised in this case.

The Judgment of the Court below is reversed, and Judgment entered upon the special verdict for the plaintiff in error, who is the defendant below.