## George *versus* Morgan.—Worrall *versus* Same.

1. The rule in Shelly's case is a settled rule of property in Pennsylvania; and in deciding whether a devise is within the rule, no influence is to be conceded to any supposed prohibition of the rule by the testator, or to the defeat of a particular intention. The leading inquiry is what is the great object of the devisor; but where the form of the disposition is constituted of terms of art, to which an ascertained meaning has been fixed by decision, the construction settled is binding on courts.

2. Where a testator devised as follows: "I give and bequeath unto my son Mordecai all that messuage or tenement situate, &c., with all its rights, members, privileges, and appurtenances, to hold to him for and during his natural life, and, after his decease, to the heirs of his body, lawfully begotten, and to their heirs for ever; and, in default of such issue, then to the heirs of my son Samuel, and their heirs for ever:" *Held*, that by the devise Mordecai took an estate-tail, under the rule in Shelly's case.

3. In a devise of lands a limitation of them in default of issue, means *an indefinite failure of issue*, unless there be something in the context to qualify the expressions, or the reference be expressly to persons then existing.

4. Superadded words, serving to limit a fee in the issue of the first taker, engrafted on words of procreation, will not operate to turn these into words of purchase, unless the superadded words denote a *different species of heirs* from that described in the first words, and showing an intent to break the ordinary line of descent from the first taker.

5. An intention to change the line of descent is not sufficiently manifested when the superadded words *import* eventual distribution of the estate; to have that effect, distribution must be expressly contemplated.

6. In Pennsylvania, a testator as to real estate, is to be regarded as speaking in reference to the common-law system of descent. Per BELL, J.

7. A deed from a tenant in tail purporting to bar the entail, but never entered on record and recorded, as required by law, and thus incompetent to bar the entail, was nevertheless held to be good to convey the grantor's right of possession, and was therefore admissible in evidence.

ERROR to the Common Pleas of *Delaware county*.

John Morgan, being seized in fee simple of the premises in dispute, made his last will on the 6th day of 8th month, called October, 1744, which will was proved on the 9th day of December 1744.

By this will, *inter alia*, the said testator devised in the following words:

"Also I give and bequeath unto my son Mordecai, all that messuage or tenement plantation situate in Radnor aforesaid, called by the name of the Hall of Nantmell, which I purchased of Richard Orme, deceased, with about thirty-eight acres of woodland, part of my other land adjoining, as, by a late survey appears, containing in the whole about two hundred acres, with all its rights, members, privileges, and appurtenances, *to hold to him for and during his natural life, and, after his decease*, to the heirs of his body, lawfully begotten, *and to their heirs for ever;* and, in default of *such issue*, then to the heirs of my son Samuel, and their heirs for ever."

[George *v.* Morgan.]

CHAPMAN, J., charged the jury that, by the above devise, Mordecai Morgan took an estate-tail, under what is called the rule in Shelly's case.

This instruction and charge was excepted to by the defendants below, and reduced to writing and filed at their request.

It forms the *first* error assigned, viz.: "That the judge erred in instructing the jury that Mordecai Morgan took an estate-tail under the devise made to him in the will of John Morgan, dated the 6th October 1744."

This was the main question in the cases.

The following plan will show the situation of this family, so far as connected with the present questions:

John Morgan, the testator, will and decease in 1744.

Mordecai Morgan 1st, born 1713, died 1804, son of John.

Mordecai Morgan 2d, only child of M. Morgan 1st, born in 1742, died July 1794, was in being at the date of will of John Morgan.

Mordecai Morgan 2d, left six children, of whom James was the eldest, viz.:

James.   Joshua.   Samuel.   John 2d.   Mordecai 3d.   Maria.

James Morgan died about ten years ago, and left seven children, of whom Joshua, still alive, is eldest, viz.:

Joshua.   Sarah.   Hannah.   James.   Joseph.   Samuel.   Edwin.

Joseph Morgan and Samuel Morgan, younger children of James Morgan, were the plaintiffs.

The evidence showed that Mordecai Morgan 1st always lived on the two hundred acres thus devised to him, and died in possession in January 1804, aged about 94.

Mordecai Morgan 2d was the only son of Mordecai Morgan 1st. He also lived upon these two hundred acres, and died before his father, in July 1794, aged about 51 or 52 at the time of his death.

[George *v.* Morgan.]

He was consequently in being, and more than two years old, when the will of John Morgan, his grandfather, was made, in October 1744.

At the death of Mordecai Morgan the 1st, in January 1804, and from that time up to 1807, *all the six children of Mordecai Morgan the 2d* lived and made their homes on these two hundred acres.

In this interval, between 1804 and 1807, (about 1805 or 1806,) all the six children of Mordecai Morgan the 2d joined in building a barn, thirty-five by sixty feet, on these two hundred acres. Joseph, one of those children, was a mason; Samuel and John, two others, were carpenters. None of them got any thing for their labour. They all lived there together.

In 1807, the six children of Mordecai Morgan the 2d made an amicable division of these two hundred acres; James, the eldest, took sixty acres, with all the buildings, and *made a deed* for the residue, being about one hundred and thirty acres, to his four brothers and his sister Maria. They (the four brothers and sister) held their part in common, and afterwards divided among themselves, and released to each other. They divided after 1807.

After 1807, James never pretended to have possession. His brothers and sister had possession till they sold: when they sold, the parties to whom they sold went into possession.

The defendants below, and those under whom they claim, were, and since 1809 have been, in possession of the premises described in the several declarations in ejectment, being a part of the one hundred and thirty acres above mentioned, under title derived from the four brothers and sister of James Morgan, the other children of Mordecai Morgan the 2d.

The counsel of the plaintiff below offered in evidence a deed from *Joshua Morgan, the eldest son of James Morgan,* to Joseph Morgan and Samuel Morgan, two of his younger brothers, and the plaintiffs in these actions, dated January 20, 1848, purporting to bar an estate-tail, together with the record of the Court of Common Pleas of Delaware county, which was objected to as ineffectual for that purpose, not having been entered on record in the proper county, within *six* months, as required by law; but the same was admitted by the court, under an exception on part of the defendants, as evidence of the transfer of such title as was vested in Joshua Morgan. The effect and bearing of this deed is explained in the charge of the court delivered by CHAPMAN, President Judge, as follows:

The plaintiffs, in the first case, claim about thirty-six acres of land, now in the possession of Sarah George, and in the latter, they claim two acres, two roods, and twenty-two perches, now in the possession of Sarah Worrall. They have given in evidence a deed, dated the 20th of January, A. D. 1848, from Joshua Morgan

[George *v.* Morgan.]

to them, purporting to convey his interest in the property in dispute.  Although the act of Assembly to facilitate the barring of entails has not been complied with, whereby the deed is ineffectual for such purpose, still it is the opinion of the court it is available in the claim to possession.

The question in these cases is, whether, under the will of John Morgan, dated the 6th of October 1744, Mordecai Morgan took an estate-tail?  We charge you he did, and if you believe the evidence, the estate descended to the grantor of the plaintiffs.  In such case, your verdicts must be for the plaintiffs.

To this charge, defendants' counsel excepted.

The jury returned a verdict for the defendants in each case, which verdicts were immediately set aside by the court.  Whereupon, by agreements filed, verdicts were entered in each case for the plaintiffs, subject to the bills of exception taken to the admission of the evidence, the exception to the charge of the court, and the right to purchase writs of error, with the same effect as if verdicts for the plaintiffs had been originally rendered.

The defendants below, on the trial, gave in evidence a deed of release signed by James Morgan, father of Joshua Morgan, under whom the plaintiffs claim, of all interest in the land in dispute, to his brothers and sisters, including Mordecai Morgan, dated June 16, 1807, made for the purpose of effecting partition of the estate of John Morgan.

The will of John Morgan, before referred to, was in part as follows:

First, my will is, that all my just debts and funeral charges be fully paid by my executor.  Also I give and bequeath unto my son Samuel, all that messuage or tenement, plantation, and tract of land thereunto belonging, commonly known or called by the name of Vainer, whereon I now live, containing about one hundred and sixty acres, (be it more or less,) with all its rights, members, privileges, and appurtenances, to hold to him for and during his natural life, and after his decease then to the heirs of his body lawfully begotten, if a son, and to his heirs for ever, and, if only daughters, then equally between them and their heirs for ever, provided always, and if his now wife survive him, then my will is, that she shall have and enjoy one-half of the rents and profits of my said plantation, for the benefit of her and my grand-children by her now husband, during such time as she remains his widow, but in case of her intermarriage with another person, then, my will is, that she shall have only five pounds a year paid her out of the rents and profits of the said plantation, during her natural life.  Also, I give and bequeath to my said son, Samuel, all my messuage or tenement plantation, and one hundred acres of land thereunto belonging, situate in Radnor aforesaid, commonly known or called

[George *v.* Morgan.]

by the name of Brin-Sion, with all its rights, members, privileges, and appurtenances, to hold to him and his heirs for ever, out of which his wife is to have no dowry or inheritance whatsoever, if she survives her said husband.

Also, I give and bequeath unto my three grand-daughters, Sarah, Elinor, and Jane Morgan, daughters of my said son Samuel, one hundred and twenty pounds, lawful money of Pennsylvania, to be equally divided between them, each to have their respective share when they attain the full age of eighteen years, and in case either of them die before they attain that age, then the said sum to be to the survivors or survivor of them living to the age aforesaid.

Also, I give and bequeath unto my son Mordecai, all that messuage or tenement plantation situate in Radnor aforesaid, called by the name of the Hall of Nantmell, which I purchased of Richard Orme, deceased, with about thirty-eight acres of woodland, part of my other land adjoining, as by a late survey appears, containing in the whole about two hundred acres, with all its rights, members, privileges, and appurtenances, to hold to him, for and during his natural life, and after his decease to the heirs of his body lawfully begotten, *and to their heirs for ever*, and in default of such *issue*, then to the heirs of my son Samuel, and their heirs for ever.

 * * * * * * *· * * *

And I do hereby nominate and appoint my sons Samuel and Mordecai sole executors of this my last will and testament. To whom I give and bequeath all the rest and remainder of my estate, not hereinbefore given, of what kind, nature, and quality whatsoever and wheresoever to be found, to be equally divided between them.  * * *

In testimony whereof, &c.

It was assigned for error:

1. That the judge erred in instructing the jury, that Mordecai Morgan took an estate-tail under the devise made to him in the will of John Morgan, dated the 6th of October 1744.

2. That the judge erred in admitting in evidence the deed from Joshua Morgan to Joseph Morgan and Samuel Morgan, dated January 20th, A. D. 1848, together with the record of the Court of Common Pleas of Delaware county, or either of them, as stated in the bill of exceptions.

3. That the court erred in instructing the jury, that "although the act of Assembly to facilitate the barring of entails has not been complied with—whereby the deed (of 20th January, A. D. 1848) is ineffectual for such purpose—still it is the opinion of the court it is available in the claim to possession."

4. The court erred in instructing the jury to find verdicts for the plaintiffs.

[George *v.* Morgan.]

5. The court erred in refusing and omitting to instruct the jury to find verdicts for the defendants.

*Lewis,* for plaintiff in error.—1st point.    In construing this devise, effect is to be given to every word employed by the testator to manifest his intent, and no word or phrase is to be rejected to which effect can be legally given.    In cases of wills, the governing rule of construction is the intent of the testator, which the court is to find out by his words, and to construe conformably thereto, as far as possible, consistent with the rules of law:" Lord HARDWICKE, in Browswood *v.* Edwards, 2 *Ves. Sr.* 247; Frogmorton *v.* Bramstone, 3 *Bur.* 1622.    "Within a century past a more liberal construction of the words of a testator has prevailed :" Goodright *v.* White, 3 *Bl. Rep.* 1010.    It is the cardinal rule in the construction of wills that the intention of testator to be collected from the whole instrument—or as is sometimes expressed, from the four corners—is to govern: per Justice ROGERS, in Johnson *v.* Morton, 10 *Barr* 247; *id.* 500, per COULTER, J.

The construction given to this devise below, requires that the words "for and during his natural life, and after his decease," as also the words " and to their heirs for ever," shall be expunged or disregarded as expressions indicative of the testator's intent. This liberty is taken with the will, on the ground that some *general intent* may be thus answered, to which any *particular intent* is to give way.    But in this devise there is no conflict between a particular intent and a general intent.    Mordecai the first, can take for life, remainder to his issue or children living at his death, in fee.    This violates no rule of legal policy.    Besides, these phrases are vague at best, and might well be exploded.

*Powell,* remarking on the case of Wright *v.* Leigh :—" The case cannot be considered as having any weight in producing a revival of the absurd, and, we have seen, discarded doctrine of general and particular intention, of which the writer will only further observe, that since it has long ceased to exist—if it ever existed—*in fact,* it were much to be wished that it were completely exploded in name." And calls it a doctrine vague and indefinite, " and fraught with absurdity and mischief :" 2 *Powell on Devises* 559.

The intention in this case, independent of any artificial rules of construction, is manifest.

At the time the will was made, Mordecai the first had a son, to whom the terms issue and heirs of his body might apply.    He, Mordecai the first, was a young man, aged thirty-one at the date of the will, and might have other children ; and if he should have, it was not intended to exclude them.    They were the persons designated to take the remainder, and the words, " their heirs for ever," express the quantity of estate intended to be given, to wit, a fee simple : Goodright *v.* White, *Bl. Rep.* 1010.

[George *v.* Morgan.]

Our second point, therefore, is,—The words, " *heirs of the body,*" and " *such issue,*" as used by the testator, are to be understood as meaning *children or issue* living at the time of his decease. This construction gives effect to all the words of the devise: Archer's case, 1 *Coke's Rep.* 66; *Skin.* 430; Clerk *v.* Day, *Sir F. Moore* 593; 2 *Bl. Rep.* 1010; Long *v.* Beaumont, 1 *P. W.* 229. See also Henry *v.* Purcell, 2 *Bl. Rep.* 1002; Bagshaw *v.* Spencer, 1 *Ves. Sen.* 142; same case, 2 *Atk.* 570; 3 *East* 103; Table 2, 7 *Law. Lib.*; 2 *Burr* 1109; 7 *Taunton* 362; 5 *B. & C.* 866; 12 *Eng. C. L.* 392.

These are all English cases. It is not doubted that in England at the present day the devise now before the court would not be decided to give to Mordecai Morgan the first an estate-tail under the rule in Shelly's case; but, on the contrary, the plain intention of the testator would be allowed to prevail.

If among the decisions in the English books, some exist which cannot be reconciled, it may be lamented; but we are not to suffer for this. Pennsylvania has her own law on this subject, perfectly adapted to her own peculiar situation, settled by a long series of solemn adjudications; all of which are not now to be changed by the reappearance of the rule in Shelly's case. Long prior to the date of the will of John Morgan, (1744,) primogenitureship (if it ever had existed within her limits) had been renounced as inconsistent with both the feelings and prosperity of the people. This vital and wide difference between the descent of real estate in the two countries could not fail to have its effect upon the application of the rule in Shelly's case.

The " superadded words," as they are called, are admitted by every text writer (except, perhaps, Hargrave) to take a case out of the application of that rule, wherever " they break the line of descent." Why so? Because in such case they show the intention of the testator. In England, in nineteen instances out of twenty, the descent of the fee simple and the estate-tail are the same. In Pennsylvania, in nineteen instances out of twenty they vary. It follows, then, that the intention shown by the use of the superadded words is twenty times as strong in Pennsylvania as it would be in England. These superadded words exist in our case, although they were thrown out of it by the judge below without any reason assigned.

In *Pennsylvania,* where the word *heirs* is used, it is not applicable only to the heir at common law, but refers to our system of descent: 4 *Pa. L. J.* 193; 2 *Yeates* 54; 2 *Bin.* 20; 10 *Watts* 190; 3 *Barr* 158.

The leading case in Pennsylvania is that of Findley *v.* Riddle, 3 *Bin.* 139. This case was carefully argued three times. First, before Chief Justice TILGHMAN, at a circuit court for Franklin

[George v. Morgan.]

county, in June 1807, when he intimated an opinion that John took only an estate for life, but reserved the point.

2d. It was argued before him on a motion for a new trial, when he said, "Nothing can be more clear than that the testator meant to give his son John an estate for life only."

The case then came, by appeal, before the court in banc.   In the opinions of the court, it is believed that almost every case upon the subject decided in either England or Pennsylvania up to that time was collected and investigated.   See also Dunwoody v. Read, 3 *Ser. & R.* 435, where the same doctrine is held, so far as regards the estate-tail; Abbot v. Jenkins, 10 *Ser. & R.* 296.

In the case before us, there is the express estate for life to Mordecai Morgan the first, and the remainder is limited to all his issue, not successively, but to take all at the same time equally, and in fee simple.   The time when they are so to take, is the death of Mordecai Morgan the first: 5 *Rawle* 231.

These cases are sufficient to establish the doctrine that at least in Pennsylvania the *plain intention* of the testator is at this day too strong for what was the rule in Shelly's case.   Intention is paramount to all technical words: Miller v. Lynn; 7 *Barr* 443; Thompson v. Currin, 10 *Barr* 498.

If the rule in Shelly's case must be applied to this devise, the proper application of it will give to Mordecai Morgan the first *a fee simple*, and not an estate-tail.

3d. The bill of exceptions to the admission in evidence of the instrument dated 28th January 1848, and the proceedings to bar the estate-tail, may be considered in connection with the charge of the court that such instrument was sufficient to enable the plaintiff to recover.   The court admitted that such instrument had no effect to bar the estate-tail.   Then it was a mere nullity.   The object for which alone it was made utterly failed.   It had no legal existence until recorded within six months in the recorder's office of the proper county.   It never has been so entered.   If any estate-tail existed, it still remains in Joshua Morgan, the eldest son of James Morgan.   The instrument was intended to convey, and did convey, an estate-tail or nothing.   This is apparent on its face.   There is no consideration for it, if it did not pass an estate in tail.

The deed of 16th June 1807, from James Morgan to Joseph Morgan and others, was a partition which these plaintiffs cannot dispute.   No one but the owner of the estate-tail can do so or recover these premises.

*E.* and *W. Darlington*, for defendants in error.—1. Mordecai Morgan, the devisee, took an estate-tail in the premises in question under the will of his father, by virtue of the rule in Shelly's case. That rule is, "When the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an

[George *v.* Morgan.]

estate is limited, either mediately or immediately, to his heirs in fee or in tail, always in such cases heirs are words of limitation of the estate, and not words of purchase:" 1 *Co.* 104 a; *Co. Litt.* 376. This is regarded as an unbending rule of property in England and in Pennsylvania, in all cases falling within its terms: Findley *v.* Riddle, 3 *Bin.* 159; Carter *v.* McMichael, 10 *Ser. & R.* 429; Paxson *v.* Lefferts, 3 *Rawle* 59. This case falls strictly within the rule—Devise "to M. for life"—"and after his decease to the heirs of his body lawfully begotten, and to their heirs for ever"—"and in default of such issue," over. The cases both in England and in this State show that the rule is maintained, and the question here presented has been again and again substantially decided: See 4 *D. & E.* 82; 2 *Strange* 729; Shelly's case, 1 *Coke* 104 a; *Hayes on Estate-tail*, 7 *Law Lib.* 106; 1 *Yeates* 332, 10 *Ser. & R.* 429, Carter *v.* McMichael; 1 *id.* 203; 17 *Ser. & R.* 444; 3 *Rawle* 59; Heilman *v.* Bouslaugh, 1 *Harris* 344.

2. The deed from Joshua Morgan to Joseph and Samuel Morgan, although not recorded so as to bar the entail, nevertheless conveyed the life estate of the tenant in tail, and in this possessory action is sufficient to entitle plaintiff below to recover. It was a fair sale for valuable consideration, $400. It was not its sole object to bar the entail. Even if it were, if it could not so operate; it might operate to pass the possessory right.

Tenant in tail may convey his life estate. It may be sold from him on execution: Armstrong *v.* Dornerger, 16 *Ser. & R.* 323; Elliot *v.* Pearsoll, 8 *W. & Ser.* 38.

A conveyance in fee of a life estate is no forfeiture of a remainder: McKee *v.* Pfout, 1 *Dal.* 486.

An agreement to convey a larger estate than the party has, is good for such estate as he might possess: Rohr *v.* Kindt, 3 *W. & Ser.* 567. A sale by the sheriff of a lot, when the defendant had but a ground-rent in it—the ground-rent passes: Streaper *v.* Fisher, 1 *Rawle* 155.

*Lewis*, in reply.—The word *heirs* is not used in its strict technical sense, but indiscriminately with the word *issue*, deemed by the testator equipollent; yet issue is a word of purchase, and not of limitation, and in wills may be construed to suit the intent of the testator; 3 *Rawle* 75; 1 *Ser. & R.* 155; *Hayes on Estates-tail*, table 4; 4 *D. & E.* 294. If issue of the body be substituted for heirs of the body, the testator's intent is preserved: 1 *Ld. Raym.* 203. The word *issue* is not to be blotted from the will; it explains testator's intent. Issue and heir used as synonymous in Clerk *v.* Day, *Sir F. Moore* 593. See also 4 *D. & E.* 294; Archer's case, 1 *Co.* 66; 3 *Keb.* 100.

This construction is not confined to cases in which the word *issue* occurs, but is applied where the word *heirs* is used in the same

[George *v.* Morgan.]

sense : 2 *Bl. Rep.* 1010 ; 1 *P. Wms.* 229 ; 1 *Ves. Sr.* 142. The word *heirs* is sometimes applied to *heir apparent.* See 2 *Lev.* 232. Here the words "heirs of his body" were used as equivalent *to issue or children.*

In Pennsylvania, where the word *heirs* is used, it is not alone applicable to the *heir* at common law, but refers to our system of descents: 4 *Pa. L. J.* 193 ; 2 *Yeates* 54 ; 2 *Bin.* 20 ; 10 *Watts* 190 ; *id.* 289 ; 3 *Bin.* 158 ; opinion of Judge GRIER, in the case of Packer *v.* Nixon, in the Circuit Court at Philadelphia.

*W. M. Tilghman,* also for plaintiffs in error.—Each case depends on its own circumstances. The grandfather, the testator, supposed that he was providing for all his children. The will was made 100 years ago. It was long acquiesced in. Our proposition is that the testator used the words "*heirs of his body* lawfully begotten," not in their strict legal sense, but as synonymous with *children.* The words, if construed as an estate-tail, would conflict with the estate *in fee* granted in the next clause. The rule is that where the *superadded words,* (that is, the words used after the terms "heirs of the body,") import distribution, the words "heirs of the body" are not to be construed strictly as meaning an estate-tail ; and he contended that in this case the superadded words import distribution : Crosby *v.* Davis, 4 *Pa. L. J.* As to the case of Heilman *v.* Bouslaugh, 1 *Harris,* it was on a *deed*; and in a deed the term heirs of the body are terms of art, and the court did not go into other parts of the deed to ascertain *the actual intention.* But in a will the case is different, the actual intention is to be considered. It is not, however, admitted that the term "heirs of the body" means, in Pennsylvania, an estate-tail—but that the term "heirs" imply distribution. He referred to another part of the will to show in what sense the testator used the terms "heirs of the body." In this case the limitation over is *in fee,* and is to be considered as showing that the testator was not wedded to an estate-tail.

The opinion of the court was delivered April 21, by

BELL, J.—The rule in Shelly's case has been so repeatedly recognised as a feature of our law, that further discussion is precluded. In the recent case, Heilman *v.* Bouslaugh, 1 *Harris* 344, if not satisfactorily vindicated, it is, at least, shown to be a settled rule of property in Pennsylvania, not to be put aside but at the risk of unsettling titles, and the introduction of confusion and uncertainty. Indeed, our numerous concurring decisions on this point, if any effect is to be accorded to them, must terminate, in our courts, further speculation as to the original propriety of the rule, and confine us to the inquiry whether the terms used to express the disposition of an estate fall within its operation. In

[George *v.* Morgan.]

settling this question, when it springs from a last will, no influence is to be conceded to any supposed prohibition of the rule by the testator, or to the defeat of a particular intention by its interposition. Whether it shall be effective as a governing principle is not subject to his discretion where the form of testamentary direction invites it to action, and the frequent frustration of a partial design is one of its acknowledged consequences. In its application, the effort is to give effect to the leading intent, though at the sacrifice of a minor purpose, and, therefore, in this, as in other cases, the first inquiry is, what is the great object of the devisor. The ascertainment of this is, doubtless, subject to the ordinary rules of construction; but where well-considered and unimpeached adjudications have assigned to certain forms of disposition a determinate result, we are bound by it as an ascertained law of construction. In saying this, I am not unmindful of the oft-repeated remark that, as every testament is apt to present some feature peculiar to itself, the interpretation of one can render but little aid in assisting to the proper meaning of another. This is true; but it is equally so that where a particular manner of devise has become the subject of frequent adjudication, certainly without which there is no safety, public or private, it is requisite that the rule so settled shall be followed in all similar cases. This is peculiarly so, where the form of the disposition is constituted of terms of art, to which an ascertained meaning is commonly affixed.

The devise before us stands, I think, in this category. To say nothing of numerous English cases, it is impossible to distinguish it, in principle, from our own deliberate determinations in Carter *v.* McMichael, 10 *Ser. & R.* 429; Paxson *v.* Lefferts, 3 *Rawle* 59, and the prior decisions on which they are based. It is true, that, in the first of these, the limitation was to the *heirs male* of the body of the first taker, and the heirs and assigns of such heirs male; from whence Chief Justice TILGHMAN deduced an argument favoring the application of the rule in Shelly's case. But the conclusion was not made to rest solely on this. A very important part of the argument was drawn from the fact, that unless an estate of inheritance was given to the first taker, the remainder limited over in fee simple must be defeated. And the latter condition was the governing reason in Paxson *v.* Lefferts, with a reference to the precedent case. That devise was almost, if not altogether, identical with the present. The land was given to the testator's son Charles, during his natural life, and if he should leave lawful issue, then to them, their heirs and assigns for ever; but for want of such lawful issue, over in fee. It will be observed, the only difference is in the employment of the words "lawful issue," instead of "heirs of the body," used in the first part of our disposing clause. But if there be a distinction, this difference is in favor of the construction claimed by the plaintiffs below, since

[George *v.* Morgan.]

"heirs of the body" are, strictly, words of limitation, while the other terms operate, in a deed, as words of purchase, though they may be taken either way in a will.   In our case, we may, consequently, accept, without further argument, what cost Mr. Justice KENNEDY some reasoning to prove in Paxson *v.* Lefferts, namely, that the terms employed imported limitation, and not purchase. On the argument before us, some stress was laid upon the substitution of "such issue" for "heirs of his body," as showing they were employed as expressive of the same meaning; and it was argued that as "issue of the body" are sometimes treated as terms of purchase, the court ought to lean towards that construction here.   To this, a reference to the last case might be regarded a sufficient answer; but it may be added that, as a general rule, the words relied on, used in a will in reference to an estate in land, operate as a further limitation, unless there be something in the context to show the testator contemplated a failure of issue at a particular period, and not an indefinite failure.   The question was made in Geering *v.* Shenton, 1 *Cowp.* 410, a case, in most of its features, very like the present.   It was a devise to J. S. and the heirs of his body, lawfully begotten, and their heirs for ever; but in case the said J. S. should die without leaving *issue of his body,* then over in fee.   It was held that the devisee took in tail, the words "shall die without issue of his body" qualifying the preceding general words.   As adverse to this construction, it was urged that, by the superadded words of limitation, the testator evinced an intention to give to the issue of the first taker a fee as purchasers.   But Lord MANSFIELD inquired of the counsel whether he knew of any case where, upon a limitation of lands upon a dying without issue, those words had been confined to a dying without issue living at the time of his death.   The distinction, he added, is between a devise of lands and of personal estate : in the latter case, the words are taken in their vulgar sense; that is, a dying without issue living at the time of the death of the first taker; but in the former, standing unexplained, they mean an indefinite failure of issue.   Goodright *v.* Pullen, 2 *Ld. Raym.* 1437, may also be mentioned in this connection.   There the devise was to N. for life, and, after his decease, to the heirs male of the body of the said N., lawfully to be begotten, and his heirs for ever; but if the said N. shall happen to die without such heir male, then over.   It was argued that the use of the word "his," in the singular, brought the devise within Archer's case, and, consequently, the first taker took but an estate for life.   But the court answered that, "heirs male of the body" imported an estate-tail, and this was not to be overruled by doubtful expressions; that ever since King *v.* Melling, 3 *Keb.* 100, it was so settled as not to be disputed, that the word "heirs" is, properly, a word of limitation, and not

[George *v.* Morgan.]

of purchase, and so, in a will, is "issue" unexplained, though it is different in a deed.

Indeed, it may be safely asserted that the words "if he shall leave issue," or "in default of issue," and the like, are uniformly construed to mean an indefinite failure of issue, unless there be something in the context to qualify the general expression, or the reference be expressly to persons then existing. As early as Wilde's case, this doctrine was averred, and it is said that whenever the term "issue" is used in reference to persons not in *esse*, it is synonymous with the terms "heirs of the body." Nor is it enough, to avoid this consequence, that the person named as the source of inheritable blood had issue at the date of the devise, unless it appear such living issue was, particularly, in contemplation of the testator at the moment, as the commencement of an inheritable stock. Of this, Goodright *v.* White, 2 *Bl. Rep.* 100; Long *v.* Beaumont, 1 *P. Wms.* 229, and Bagshaw *v.* Spencer, 1 *Ves. Sen'r* 142, are usually cited as examples. They were devises to the heirs of the body or issue of persons known to the testator to be in full life, having children, and the questions were whether there was a sufficient designation of the persons to take? From the very nature of the case, it was held the parties thus pointed to might take *designatione personæ*, and as though they had been specifically named. It is scarcely necessary to add, this doctrine has no application in the instance before us, though the first Mordecai had a son living at the time of the devise. Had that son died, it cannot admit of doubt any subsequently born issue would have taken under this devise, as heir of the body and competent to carry on the succession by inheritable blood.

To the cases already noticed, I will only add Morris *v.* Le Gay, cited by Lord KENYON in Denn *v.* Puckey, 5 *D. & E.* 324, and with approbation, in our own cases of Carter *v.* McMichael, and Paxson *v.* Lefferts. I introduce it, because it appears to me to be exactly alike, and decisive of the present. The devise was to A. for life, remainder to the heirs of the body of A. *and their heirs,* and if A. died *without issue of her body,* over. It was decided that A. took an estate-tail.

The adjudications I have referred to, and those upon which they are based, furnish an answer to the objection most prominently urged for the defendants below, that the superadded words, serving to limit a fee in the issue of the first taker, show the testator intended to constitute them the stock of a new descent as purchasers, and they are, therefore, not to be treated as branches of their own progenitors. It has long been settled that superadded words of limitation engrafted on words of procreation will not operate to turn these into words of purchase, unless the superadded word denote a different species of heirs from that described by the first words, thus showing an intent to break the ordinary

[George v. Morgan.]

line of descent from the first taker : *Har. Law Tr.*, 504; 1 *Ferne Rem.* 181.   Following Ferne, Mr. Justice KENNEDY lays it down, in Paxson *v.* Lefferts, 3 *Rawle*, 59, that if the words be "heirs," or "heirs of the body," or "issue of the body," words of inheritance engrafted on them, if not inconsistent with the nature of the descent pointed out by the first words, will not convert them into words of purchase.

But it is urged upon us that as, in England, an intention to change the line of descent is sufficiently manifested wherever the superadded words import eventual distribution of the estate among several, as if it be limited over as a tenancy in common, or to be divided equally among all the heirs of the first taker,—in Pennsylvania, since the abolition of the right of primogeniture, such a devise as we have here, must be taken as changing the descent; the superadded words, "and to their heirs for ever," necessarily importing, not the heir in tail, who is generally the right heir in England, but all the lineal descendants of the *præpositus*, who take as parceners with us, under the general title of heir.   I confess, I was much struck with the view when it was first presented, and very much inclined to adopt it as consistent with reason. But further reflection has satisfied us it is inadmissible.   In the first place, it frequently happens that, even in England, the right heirs of a deviser may be of persons entirely different from him who would alone take as heir in tail, and yet it has always been there held as essential, that to withdraw the devise from the power of the rule, distribution must be expressly contemplated, and shown to be so by some precise direction.   Secondly, though in Findlay *v.* Riddle, 3 *Bin.* 139, Mr. Justice YEATES seemed much inclined to adopt the idea that, with us, a limitation to heirs general always imports distribution, and is therefore repugnant to the rule in Shelly's case, it was not received in our subsequent cases, though expressly urged upon the attention of the court, where full scope was afforded for its operation, had it been thought tenable.   In the last case of Heilman *v.* Bouslaugh, the reasoning of the chief justice is in direct repudiation of it.   All this is conclusive that, in this State, a testator is to be regarded as speaking in reference to the common-law system of descent.

The exception taken to the admission in evidence of the deed from Joshua Morgan to the plaintiff below was but little urged. Though inoperative to bar the entail, it is, questionless, good to convey the grantor's right of possession.   A tenant in tail may convey his life estate, and surely an attempt to convey a larger interest, which fails from a merely technical objection, may carry such an estate as would pass without the omitted ceremony.   As his beneficial right of present enjoyment may be sold under an execution, without affecting the future tenant in tail, Armstrong *v.* Dunager, 16 *Ser. & R.* 323 ; Elliot *v.* Pearsoll, 8 *W. & Ser.* 38,

[George *v.* Morgan.]

it will certainly pass by private grant; and this may exist under semblance of a grant of his whole estate, just as an agreement to convey a larger estate than the party has, is good for such estate as he may hold; Rohr *v.* Kindt, 3 *W. & Ser.* 567. The conveyance works, in fact, two distinct effects; one at common law, to pass the present interest; the other under the statute, to bar the entail, a defect in which can only be objected by a tenant in tail.

Judgment affirmed.

COULTER, J., dissented.